UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

----------------------------------------------------------X

MELANIE TOLBERT,

PLAINTIFF,

Docket No.:

v.

**COMPLAINT AND JURY DEMAND**

HIGH NOON PRODUCTIONS, LLC,

HIGH NOON PRODUCTIONS, LLC d/b/a

HIGH NOON ENTERTAINMENT, and

HIGH NOON ENTERTAINMENT,

DEFENDANTS.

----------------------------------------------------------X

Plaintiff MELANIE TOLBERT, through her undersigned attorneys, hereby alleges, upon information and belief, as follows:

<strong>PARTIES</strong>

1.      That at all relevant times herein mentioned, Plaintiff MELANIE TOLBERT was and is a resident of the State of Alabama.

2.      That at all relevant times herein mentioned, Defendants HIGH NOON PRODUCTIONS, LLC, HIGH NOON PRODUCTIONS LLC d/b/a HIGH NOON ENTERTAINMENT and HIGH NOON ENTERTAINMENT is/are a limited liability corporation organized in the State of Colorado, with a principal office address of/principal place of business located at/headquarters located at 3035 South Parker Road, Suite 500, Denver, Colorado 80014. Defendants do business as "High Noon Entertainment" and is a self-described reality TV production company with offices based in Denver, Colorado and Los Angeles, California.

1

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction herein pursuant to 28 U.S.C. §1388(a) because of this Court's exclusive jurisdiction over copyright cases.

4.      Venue is proper pursuant to 28 U.S.C. § 1400(a) because the Defendants maintain their principal place of business and/or headquarters, and operates their business/transacts business, within this District and therefore personal jurisdiction may be properly obtained over the Defendants.

5.      Plaintiff brings her claims under the Copyright Laws of the United States, 17 U.S.C. § 101 *et seq.*, and under Colorado law.

6.      This Court has exclusive jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338. This Court has supplemental jurisdiction over claims brought under Colorado law pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400 as the Defendants have conducted such business in Colorado so as to constitute having sufficient minimum contacts with Colorado, such that Defendants should reasonably anticipate being haled into court within the State of Colorado. As Defendants maintain their principal place of business/headquarters in the State of Colorado and operate their business in the State of Colorado, Defendants have purposefully availed themselves of the privilege of conducting activities within Colorado and have purposefully directed efforts toward residents of Colorado. More specifically, Defendants have, as claimed below, infringed upon Plaintiff's copyrighted work/trade secret by producing and/or causing to be produced, one substantially similar and, having had such access to Plaintiff's work as necessary, then broadcasting it through their business affiliate HGTV knowing that it

would be broadcast via satellite and/or cable into/in Colorado. Defendants knew that such infringing activity would reach Colorado citizens.

## GENERAL AND FACTUAL ALLEGATIONS

8.     Plaintiff MELANIE TOLBERT is an actress, writer, and singer who has been performing since she was 12 years old. She has worked in several motion pictures and in episodes of several television programs. She has created and written eight intellectual properties, i.e., film and TV projects. She has worked in the entertainment industry for more than 15 years. She is a native of Alabama and received her B.A. in Literature, Arts and Society from the University of Alabama.

9.     Plaintiff has appeared as a supporting actress in *Mr. and Mrs. Smith* and *Garfield II.*

10.     Plaintiff has further worked as a "stand-in" and "double" for Hollywood actress Angelina Jolie in six motion pictures: *Maleficent, Salt* (posters), *Changeling, Good Shephard, Mr. and Mrs. Smith,* and *Taking Lives.*

11.     Likewise, Plaintiff has appeared as a stand-in in the movies *American Pie, Casa de mi Padre,* and *Dinner for Schmucks.*

12.     Plaintiff was a quarter-finalist in the prestigious "Shore Scripts" writing competition, and has been a member of the Screen Actors Guild since 2003. She has five screenplays registered with the Writers Guild.

13.     Plaintiff is also the creator of numerous intellectual properties including the renovation TV pilot, "Like Mother, Like Daughter"; "Cedar Box," a western; "Almost Killed the Dogs," about a serial killer; "Tetendeit," about a government conspiracy; "Secret Agent Max," designed for preschool children; "Chasing a Dream," a reality drama; and "Sooisid," a television

drama.

14.     In 2014 Plaintiff moved back to Alabama from California to be with and help take care of her mother following two years in which her mother lost her husband (Plaintiff's father) and her daughter (Plaintiff's sister), and also lost the family home and business.

15.     Plaintiff continued in the entertainment field pursuing her own projects.  One such project was a mother-daughter renovation TV show.  Plaintiff and her mother watched the HGTV renovation channel regularly, and Plaintiff and her mother often did renovation projects separately and together.  Plaintiff came to realize that she had seen no mother-daughter shows on television, and thus her mother-daughter TV show was born.  She researched the issue and found that indeed as of 2014, there were no such mother-daughter renovation TV shows.

16.     At the same time, in or about July 2014, Plaintiff contacted producers and a network in the home renovation genre about her mother-daughter show details.  In order to induce these producers/network to discuss and produce the mother-daughter renovation TV show with her, Plaintiff decided to produce a "teaser" video.

17.     Plaintiff set up her lights and camera, called "action!" and the two filmed her mother-daughter teaser video, "Like Mother Like Daughter."  The teaser video demonstrated her uniquely original TV show, show details, content, ideas and proposed elements to be included in the proposed TV show.

18.     Plaintiff's teaser video depicted her and her mother renovating part of a house while interacting as mothers and daughters do, discussing details, laughing, and interacting with their dogs on set, creating a warm, family feeling.

19.     In July 2014 she communicated her proposed mother-daughter renovation TV show and show details contained and reflected in the teaser video with an agent, officer, or employee of

"Renovation Realities," owned by Scripps Networks and/or HGTV; Scripps Networks being the parent company of HGTV. After back and forth correspondence, Renovation Realities ultimately declined to use Plaintiff's mother-daughter TV renovation show.

20.     Upon information and belief, Renovation Realities conveyed the mother-daughter renovation TV show and specific details, content and ideas to HGTV.

21.     Plaintiff continued her efforts to contact producers in the home renovation genre. These producers had an established professional relationship to HGTV and/or to Defendants, and, to the current production team of "Good Bones."

22.     "Good Bones" is the infringing work that Defendants created, produced and/or caused to be created/produced by/with HGTV and further created/produced and/or caused same to be created/produced based on substantially similar elements of Plaintiff's mother-daughter renovation TV show and its teaser video.

23.     Also, in July 2014, Plaintiff contacted producer, "A," a CEO and founder of a large media company who had worked directly with HGTV. He forwarded Plaintiff's email to producer "B," who works for another large media company and who had also worked directly with HGTV. He stated that "the mother daughter team of renovators is interesting" and asked to see Plaintiff's teaser video which she sent to him by email. He acknowledged receiving the teaser video, but ultimately declined to use Plaintiff's mother-daughter TV renovation show.

24.     Upon information and belief, producer A or producer B conveyed the mother-daughter TV renovation show, show details, content, ideas and the teaser video to HGTV and/or to Defendants herein.

25.     Another producer Plaintiff contacted in 2014, "C," likewise had an established relationship with HGTV and/or with Defendants. He responded to Plaintiff and that he "love[d]

the idea of a mother/daughter renovation team," but was not sure who would be interested in Plaintiff's mother-daughter TV renovation show. Shortly thereafter, he began working with HGTV again.

26.    Upon information and belief, producer C conveyed Plaintiff's mother-daughter TV renovation show, show details, ideas, content, elements and the teaser video to HGTV and/or to Defendants, for whom he had begun working shortly thereafter.

27.    Another producer Plaintiff contacted in 2014, "D," had worked often with HGTV. Producer D forwarded Plaintiff's information and teaser video to a second producer, "E," who had previously worked with the actual producer of the infringing work "Good Bones." Producer E told Plaintiff that her project did not fit with the current programming mandates of their network partners. One of their network partners is HGTV. These producers ultimately declined to use Plaintiff's mother-daughter TV renovation show.

28.    Upon information and belief, producer D or producer E conveyed Plaintiff's mother-daughter TV renovation show, show details, content, elements and the teaser video to HGTV and/or to Defendants herein.

29.    Another producer Plaintiff contacted in 2014, "F," worked directly for HGTV. He gave Plaintiff constructive criticism, noted that more work needed to be done on the teaser video, and noted that he had "good connections to a production company with a large development department that sells shows all the time," which aptly describes, among others, Defendant High Noon.

30.    Upon information and belief, producer F, who worked directly for HGTV at the time, conveyed Plaintiff's mother-daughter TV renovation show, show details, content, ideas, elements and the teaser video to HGTV and/or to Defendants herein.

31.     Plaintiff pitched, provided and/or sent her mother-daughter TV renovation show, show details, content, ideas, elements and/or teaser video to producers and/or executives of/with/associated with/affiliated with HGTV, Discovery and/or Defendants herein including, but not limited to:

a.      Abra Edelman of Edelman Productions – produces HGTV's "Curb Appeal";

b.      Tyler M. Hall – production of HGTV's "House Hunters Renovations";

c.      Tracy Burns – production of HGTV's "House Hunters";

d.      David Eisenberg – Director- production of HGTV's "House Hunters International";

e.      Wendy Hall of Leopard Production Co. – HGTV;

f.      Nick Rigg – production of HGTV's "House Hunters International";

g.      Babette Canton – producer of HGTV's "House Hunters";

h.      Tom Brickner – production of several HGTV shows;

i.      Kevin Moriarty – production of Discovery's/Food Network's "Rachel Ray Show";

j.      Julian Locke – production of HGTV's "MAN CAVEs";

k.      Lynnette M. Myers – production of HGTV's "Property Brothers";

l.      Sebastian Cluer – production of HGTV's "Home Inspection"; and

k.      Katie Daigle – Vice President Production & Development with HGTV/Discovery

32.     Moving forward, in or about July 2017, Plaintiff first discovered that Defendants had filmed and televised a show, to wit: "Good Bones" with substantially similar show details, ideas, content and/or elements and utilized Plaintiff's show details/content/ideas/elements contained in her video. These substantial similarities between her work and "Good Bones", the infringing work, include, but are not limited to the following:

a.    In Plaintiff's show, the show is a mother-daughter team; in Good Bones' show, the show is a mother-daughter team;

b.    In Plaintiff's show, the mother is a professional; in Good Bones' show, the mother is a professional;

c.    In Plaintiff's show, the daughter is "artsy;" in Good Bones' show, the daughter is "artsy";

d.    In Plaintiff's show, the daughter takes the lead in directing activities and proposing ideas for the renovation; in Good Bones' show, the daughter takes the lead in directing activities and proposing ideas for the renovation;

e.    In Plaintiff's show, the mother-daughter are self-taught renovators, with neither having any professional construction experience; in Good Bones' show, the mother-daughter are self-taught renovators, with neither having any professional construction experience;

f.    In Plaintiff's show, the daughter was single when the character was cast; in Good Bones' show, the daughter the daughter was single when the character was cast;

g.    In Plaintiff's show, the women exhibit strong personalities with each other; in Good Bones' show, the women exhibit strong personalities with each other;

h.    In Plaintiff's show, the women are dog lovers and their dogs appear on film; in Good Bones' show, the women are dog lovers and their dogs appear on film;

i.    There is substantial similarity in the introductory remarks for each show.   In Plaintiff's show, Plaintiff introduces her show with, "I'm Melanie; I'm the daughter," after which the mother says, "I'm Janice, and I'm the mother;" In Good Bones' show, the daughter says, "I'm Mina and this is my mom, Karen";

j.      In Plaintiff's show, the theme, feeling, and setting of the show is a mother-daughter team renovating dilapidated houses; in Good Bones' show, the theme, feeling, and setting of the show is a mother-daughter team renovating dilapidated houses;

k.      In Plaintiff's show, Plaintiff and her mother handpainted the name of their show on their t-shirts; in Good Bones' show, the show's name appears to be handpainted on a window.  Both sets of writing looked like someone just wrote the words with a paintbrush;

l.      In Plaintiff's show the mother makes it a point to hold onto something sentimental or significant in the house to highlight their renovation.  In Good Bones' show, the mother selects keepsake or sentimental items from the houses they are renovating, to be displayed after the renovation;

m.      For Plaintiff's show, the promotional teaser shots included shots of mother and daughter sitting back-to-back in black shirts.  In Good Bones' show, footage depicts mother and daughter back-to-back, in black shirts.

33.      The above substantial similarities are not mere "scene a faire." The film production process involves time-consuming planning, as follows:

a.      Setting up a shot for TV and film is a specific, well thought out process. Nothing is done off the book or by accident as "Reality TV" shows like Defendants' infringing "Good Bones" are produced and set up in the same manner as typical high-budget scripted television shows;

b.      A shot list is put together first for each day of shooting and includes those shoots to be accomplished.  This helps keep the production on schedule and budget in check;

c.    Blocking the shot for a scene is crucial. The lighting, framing, focus and camera moves all start with blocking. Blocking determines where actors will be standing as well as the first camera position. Once the blocking is right, actors then rehearse;

d.    During this blocking, a camera assistant places marks on the floor so the actors know where to stand so as to stay in frame. Actors use this mark for each and every take. This method keeps actors in frame, in their light, and makes post production easier by having the shots match up for editing.

34.    Here, there are numerous examples of blocking and framing, with explanatory remarks, as well as other pictures showing substantial similarity between the Plaintiff's show/concepts/ideas/teaser video and Defendants' "Good Bones." *Annexed hereto and made a part hereof as Exhibit "A" are examples of the foregoing.*

35.    Plaintiff immediately contacted HGTV and told them they had taken her show and put it on the air.

36.    Plaintiff, with the assistance of her then counsel, next contacted Defendants regarding the infringement on her copyrighted work. By this time the HGTV series "Good Bones," produced by Defendant High Noon Productions, was into its second season.

37.    Back-and-forth communications ensued between Plaintiff/her counsel and Defendant High Noon, in which High Noon represented that its people allegedly contacted the stars of the new series, Mina Starsiak and Karen Laine,[1] in November 2013. Defendant High Noon further represented that its producer and/or casting director had allegedly "stumbled" onto the ladies' Facebook page for their business in Indiana, completely by accident.

38.    Conversely, various media sources containing interviews of the two stars reflect

---

[1] Ms. Starsiack and Ms. Laine will be referred to herein as the "Good Bones stars" or the "Good Bones ladies."

that the "Good Bones" stars say they were contacted in 2014 – not 2013 as claimed by Defendants herein.

39.     Further clouding the issue, the CEO of High Noon Productions is quoted in a news article from 2016 saying that "last year" High Noon had "put calls in to construction companies" and had been recommended to the Good Bones stars—which was a referral, and not an "accident." This article indicates 2015 as being the contact year – again not 2013 as Defendants also claim.

40.     After the show's stars were "discovered," the next day there was a Skype interview with the stars, and shortly thereafter Defendants sent a flip camera to the ladies to shoot footage of themselves in action for a teaser, and they shot it in two weeks.

41.     The footage was sent back to Defendants who turned it into a professional teaser. Defendants then took it to HGTV.

42.     A High Noon representative described the process with HGTV as "the easiest pitch that they had ever made."

43.     HGTV directed Defendants to proceed with the pilot.

44.     On May 4, 2015, the pilot, produced by Defendants and aired on HGTV, was shown. It aired under the name of the ladies' business, "Two Chicks and a Hammer." The title of the show would later become "Good Bones."

45.     To summarize, Defendants represented via mail to Plaintiff and her counsel a timeline of events apparently beginning in in 2013, consisting of email correspondence between the two "Good Bones" stars and Defendant High Noon's casting director. The emails, and the timeline below, show the implausibility of Defendant's assertions, and demonstrates the validity of Plaintiff's timeline—that she pitched the show and show details before any

"discovery" of the "Good Bones" stars and before any "Good Bones" concepts, footage or treatments were created:

- 2013 – (High Noon says) Ladies contacted November 12, 2013; interview on Skype the next day; camera immediately sent to ladies; footage shot within two weeks.

- 2013 – (High Noon says) Footage back to High Noon for editing by December 27.

- 2014 – Plaintiff starts pitching her show details and shoots teaser video. Posts teaser video on Youtube and sends it to Renovation Realities (owned by HGTV) July 12; reviewed by Renovation Realities in August. Plaintiff works on teaser and sends it to various HGTV-connected producers.

- 2014 – Plaintiff is advised that no one is doing a similar show nor is Plaintiff advised of any companies shooting a similar project.

- 2014 – According to "Good Bones" women, they are discovered and things move very quickly toward a pilot being approved and airing.

- 2015 – High Noon CEO says (in 2016) that they put calls in to construction companies, got referral to "Good Bones" ladies.

- 2015 – in January "Good Bones" ladies apply for copyright on "Two Chicks" logo.

- 2015 – on May 4, "Good Bones" pilot airs under the name "Two Chicks and A Hammer".

- 2015 – "Two Chicks" business incorporates (mom is an attorney).

- 2016 – First record of production/filming in Indiana; Season One begins in March.

- 2016 – HGTV obtains first copyright on show(s) (had not copyrighted pilot).

- 2017 – "Good Bones" Season Two begins in March.

- 2017 – Plaintiff learns that her show is being produced as "Good Bones".

- 2017 – Plaintiff obtains copyright on her work.

- 2017 – Plaintiff contacts HGTV and High Noon.  Communications ensue about alleged 2013 discovery of "Good Bones" stars.

46.     Following the airing, which apparently proved quite successful, the show's stars incorporated their business and filed their own copyright in 2015.

47.     HGTV did not copyright their pilot.  The first copyright obtained by HGTV for their television show was obtained in June 2016.

48.     The emails between Defendant High Noon and the "Good Bones" stars, furnished to Plaintiff in 2017, indicate a gap of 17 months between the alleged 2013 "discovery" of the "Good Bones" stars and the May 2015 airing of the pilot.

49.     Conversely, the show's stars say they were first contacted in 2014 and shot their pilot in the fall of 2014.  In addition, to present date, their website for "Two Chicks and A Hammer" states that the ladies were first contacted/disicvered by Defendants in 2014.  See _https://www.2chicksandahammer.com/about_.

50.     Likewise, all the other information available to Plaintiff shows a much shorter timeline for creation of the "Good Bones" TV show—a few months—rather than the 17-month timeline asserted to Plaintiff by the Defendants herein.

51.     The disparity between the various dates regarding the stars' discovery to the airing of the pilot makes it appear that after Plaintiff complained, there was a need for one or both Defendants to establish the earlier 2013 contact date between Defendant High Noon and the "Good Bones" ladies in order to avoid the appearance of infringement.

52.     The implication, therefore, in these circumstances is that Defendants knew that they had infringed on Plaintiff's rights in her work.

53. The obvious conclusion to be made, and the only way the available information makes sense, is that the timeline began much later than 2013; that the "discovery" of the "Good Bones" ladies came much later, perhaps late 2014 or 2015, after Plaintiff submitted her show, show details, and teaser video to HGTV's Renovation Realities and various producers who had close ties with both HGTV and with Defendants, and, that Plaintiff's show details and video were transmitted to/conveyed to/provided to/accessed by Defendants and Defendants based their show on Plaintiff's video show and details.

54. In 2017 Plaintiff applied for and was issued a Certificate of Registration from the United States Copyright Office, Registration Number PAU 3-864-046, with an effective registration date of November 21, 2017. The registration is for a work titled, "Like Mother, Like Daughter Renovations." The certificate shows that Plaintiff claimed, under oath, her year of completion being 2014. *Annexed hereto and made a part hereof as Exhibit "B" is a true and correct copy of Plaintiff's Certificate of Copyright Registration.*

55. That at all relevant times herein mentioned, and continuing to present date, Defendants have a continuing, ongoing, repeated and continuous television production working and business relationship with and access to/with HGTV and HGTV's parent company Scripps Networks as well as with/to the Discovery Channel.

56. In fact, based upon information and belief, the three founders of Defendants High Noon Productions LLC/High Noon Entertainment, prior to founding same in 1997, worked on several series for the Discovery Channel.

57. That at all relevant times herein mentioned, and continuing to present date, Defendants' continuing television production business relationship with HGTV/Scripps Networks includes, but is not limited to, the television shows/programs: "Fixer Upper"; "Fixer Upper:

Behind the Design"; "Flip or Flop: :as Vegas"; "Restored by the Fords" and many others.

58. That at all relevant times herein mentioned, and continuing to present date, Defendants' continuing television production business relationship with the Discovery channel includes, but is not limited to, the television shows/programs "American Chopper" and "Dude, You're Screwed", among many others.

## AS AND FOR A FIRST CAUSE OF ACTION

### COPYRIGHT INFRINGEMENT
### VIOLATION OF THE COPYRIGHT ACT, 17 U.S.C. 101 *et seq.*

59. Plaintiff repeats, reiterates, re-asserts, re-alleges and restates each and every allegation and factual allegation set forth in paragraphs of the Complaint numbered "1" to "58" with the same force and effect as if more fully set forth at length herein.

60. That at all relevant times herein mentioned, Plaintiff's show details, show concepts, teaser video and work titled, "Like Mother, Like Daughter Renovations" are original, creative and unique and contain copyrightable subject matter under the copyright laws of the United States.

61. That at all relevant times herein mentioned, Plaintiff is the owner of the copyright to her show, show details, show concepts, teaser video and work titled, "Like Mother, Like Daughter Renovations" which is the subject of a valid Certificate of Copyright Registration issued by the Register of Copyrights.

62. That at all relevant times herein mentioned, Plaintiff's original, creative and unique show details, show concepts, teaser video and work titled, "Like Mother, Like Daughter Renovations" is properly the subject of copyright protection.

63. That at all relevant times herein mentioned, among the exclusive rights granted to Plaintiff May under the Copyright Act are the exclusive rights to reproduce and distribute the

copyrighted materials to the public and prepare derivative works.

64.     That at all relevant times herein mentioned, and upon information and belief, Defendants have continued to copy, take, use, produce, air, televise and misappropriate Plaintiff's copyrighted work/material/trade secret to present date.

65.     That at all relevant times herein mentioned, and upon information and belief, Defendants' exploitation of Plaintiff's work/material/trade secret was made without Plaintiff's knowledge or consent and constitutes a brazen violation of Sections 106 and 501 of the Copyright Act, 17 U.S.C. §§ 106 and 501.

66.     That at all relevant times herein mentioned, and upon information and belief, Defendants' foregoing acts of infringement have been willful, intentional, in disregard for and indifferent to Plaintiff's rights herein.

67.     That at all relevant times herein mentioned, and upon information and belief, Defendants have profited substantially from their infringing activities, have collected, and continue to collect monies, profits and the like from their use, taking, producing, televising and misappropriation of Plaintiff's work, and/or any derivatives thereof, and have retained such monies/profits without submitting/tendering/compensating any amount to Plaintiff herein.

68.     That at all relevant times herein mentioned, and upon information and belief, Plaintiff work was misappropriated by Defendants without the opportunity for Plaintiff to agree to confer the benefit of consent to Defendants to copy, use, take, implement, produce, televise and/or create derivative television shows/works from Plaintiff's unique, original and creative copyrighted show details, show concepts, teaser video and work titled, "Like Mother, Like Daughter Renovations".

69.     That at all relevant times herein mentioned, and upon information and belief,

Defendants knew or should have known of the writing, creation and production of Defendants' "Good Bones", and that it contained, took, used and implemented Plaintiff's original, unique and creative protected show details, show concepts, teaser video and work titled, "Like Mother, Like Daughter Renovations" without Plaintiff's knowledge, consent, permission and authority, and, without due and lawful credit and compensation to Plaintiff for same.

70. That at all relevant times herein mentioned, and upon information and belief, as a direct result of the writing, creation, production, release, marketing, promoting, sales, performances, televising, airing, licensing and/or distribution of Defendants' "Good Bones", the Defendants herein received and accepted, and continue to receive and accept to present date, financial enrichment, financial gains, financial profits, monies, income and/or revenues from the writing, production, sale and world-wide distribution of Defendants' "Good Bones", and, further receive and continue to receive same unjustly and to the financial detriment and expense of Plaintiff as set forth herein.

71. That at all relevant times herein mentioned, and upon information and belief, Defendants were/are contractually, professionally and financially enriched by its show "Good Bones" and continue to be so enriched to present date to the detriment of Plaintiff herein.

72. That at all relevant times herein mentioned, and upon information and belief, the Defendants knew and/or should have known of the substantial similarities with their "Good Bones" and Plaintiff's work/show/protected work/content/ideas/elements/trade secret that is contained in, used in, taken and implemented by Defendants in Defendants' "Good Bones".

73. That at all relevant times herein mentioned, and upon information and belief, the Defendants wrote, created, produced, cleared, approved, released, aired, televised, promoted, marketed, and continue to do so to present date, their "Good Bones" to the complete contractual,

professional and/or financial exclusion of, detriment to, expense to and injury/damage to Plaintiff MELANIE TOLBERT as set forth herein.

74. That at all relevant times herein mentioned, and upon information and belief, the Defendants wrote, created, produced, cleared, approved, released, aired, televised, promoted, marketed, and continue to do so to present date, their "Good Bones" in a total exclusionary fashion Plaintiff, at the expense of Plaintiff, to the Defendants' unjust enrichment, and, contrary to Plaintiff MELANIE TOLBERTs exclusive rights to reproduce and distribute her copyrighted work/show/show details/show content/show elements to the public and/or to authorize derivative works under copyright law to/for Plaintiff's own benefit/financial benefit.

75. That at all relevant times herein mentioned, and upon information and belief, the Defendants have continued to release, promote, market, distribute, air, televise, create and produce their "Good Bones" while unjustly receiving, and continuing to receive to present date, perpetual financial unjust enrichment from Plaintiff's unique, creative, original and copyrighted material/work/show/show details/content/elements/trade secret/teaser video at Plaintiff's expense and to her financial detriment.

76. That at all relevant times herein mentioned, Defendants have been and continue to be to present date, unjustly enriched, financially and/or otherwise, to Plaintiff's detriment. *Annexed hereto and made a part hereof as Exhibit "C' is a breakdown of Defendants' success, increase in revenue, increase in ratings, increase in profits and other enrichments after the televising of "Good Bones".*

77. That at all relevant times herein mentioned, and upon information and belief, the Defendants have continued to further authorize and execute the airing, televising, broadcasting, production and distribution of Defendants' "Good Bones", substantially utilizing, taking and

misappropriating Plaintiff's unique, original, creative and copyrighted material/work/show/show details/show content/show elements/trade secret/teaser video in and as part of Defendants' "Good Bones" to present date.

78. That all relevant times herein mentioned, and upon information and belief, Plaintiff's material/work/show/show details/show content/show elements/trade secret/teaser video and copyrighted work was misappropriated by Defendants without the opportunity for Plaintiff to agree to confer the benefit of consent to Defendants to copy, use, take, implement, produce and/or create derivative works from Plaintiff's unique, original and creative copyrighted work/ material/work/show/show details/show content/show elements/trade secret.

79. That at all relevant times herein mentioned, and upon information and belief, Defendants knew or should have known that Defendants' "Good Bones" contained, took, used and implemented Plaintiff's original, unique and creative protected work/ material/work/show/show details/show content/show elements/trade secret/teaser video without Plaintiff's knowledge, consent, permission and authority, and, without due and lawful credit and compensation to Plaintiff MELANIE TOLBERT for same, and, knew or should have known of the substantial similarity between their "Good bones" and Plaintiff's work/ material/work/show/show details/show content/show elements/trade secret.

80. That at all relevant times herein mentioned, and upon information and belief, as a direct result of the writing, creation, production, release, marketing, promoting, performances, airing, televising, broadcasting, publishing and distribution of Defendants' "Good Bones", the Defendants herein received and accepted, and continue to receive and accept to present date, financial enrichment, financial gains, financial profits, monies, income, ratings and/or revenues from the writing, production, creations, marketing, televising, broadcasting and distribution of

Defendants' "Good Bones", and, further receive and continue to receive same unjustly and to the financial detriment and expense of Plaintiff as set forth herein. See Exhibit "C", *supra*.

81.     That at all relevant times herein mentioned, and upon information and belief, Defendants were and continue to be perpetually contractually, professionally and financially enriched by their "Good Bones" utilizing, taking, implementing and misappropriating Plaintiff's original, unique and creative protected work/ material/work/show/show details/show content/show elements/trade secret/teaser video to present date and fail and/or refuse to compensate Plaintiff for same to present date.

82.     That at all relevant times herein mentioned, and upon information and belief, Defendants, in 2019, renewed their series/television program "Good Bones" to air/televise/broadcast on HGTV for its fifth season which is slated to premiere on June 9, 2020; thereby extending and continuing Defendants' enrichment, financial and/or otherwise, from same to the continued detriment to Plaintiff MELANIE TOLBERT herein.

83.     That at all relevant times herein mentioned, and upon information and belief, Defendants have willfully and intentionally continued to receive unjust financial enrichment from its perpetual exploitation of Plaintiff's work/ material/work/show/show details/show content/show elements/trade secret/teaser video, to present date, without Plaintiff's knowledge or consent, at her expense and to her financial detriment which constitutes a violation of Sections 106 and 501 of the Copyright Act, 17 U.S.C. §§ 106 and 501.

84.     That at all relevant times herein mentioned, and upon information and belief, Defendants' foregoing acts of infringement have been willful and intentional and in deliberate disregard for Plaintiff's rights granted under copyright law.

85.     That at all relevant times herein mentioned, and upon information and belief,

Defendants have been and continue to be unjustly enriched with millions of dollars in revenues, profits, ratings and otherwise in the production, distribution, televising and broadcasting of their "Good Bones" at Plaintiff's expense, to her financial detriment and in violation of her rights under copyright law.

86.     That at all relevant times herein mentioned, and upon information and belief, it is against equity and good conscience to permit the Defendants herein to retain the ill-obtained financial unjust enrichments gained and received by Defendants and sought by Plaintiff for recovery under this action herein.

87.     That at all relevant times herein mentioned, as a result of Defendants' willful infringement of Plaintiff's copyrights and exclusive rights under copyright, Plaintiff MELANIE TOLBERT is entitled to maximum statutory damages pursuant to 17 U.S.C. § 504(c), and/or to recover actual damages and profits attributable to the infringement pursuant to 17 U.S.C. § 504(b), at Plaintiff's election, and such other relief as is provided by laws. Plaintiff MELANIE TOLBERT is further entitled to her attorney's fees and full costs pursuant to 17 U.S.C. § 505.

88.     That at all relevant times herein mentioned, and upon information and belief, the conduct of Defendants is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury that cannot fully be compensated or measured in money.   Plaintiff has no adequate remedy at laws.

89.     That at all relevant times herein mentioned, pursuant to 17 U.S.C. §§ 502 and 503, Plaintiff is entitled to injunctive relief prohibiting Defendants from further infringing Plaintiff's copyrights and ordering Defendants to destroy all copies of the infringing work and/or other material made in violation of Plaintiff's exclusive rights.

90.     That at all relevant times herein mentioned, Plaintiff is entitled to damages

including, but not limited to, the disgorgement of profits received from the creation of, production of, marketing of, promoting of, releasing of, airing of, televising of, distribution of, merchandising of and/or broadcasting of Defendants "Good Bones" which unlawfully uses, takes and misappropriates Plaintiff's original, creative and unique copyrighted and protected work/material/work/show/show details/show content/show elements/trade secret/teaser video therein.

91.     That at all relevant times herein mentioned, Defendants have, through their conduct, infringed Plaintiff's valid copyright and ownership interest in the pilot teaser video and show details/ideas/concepts/elements reflected therein in violation under the Copyright Act, 17 U.S.C. § 101 *et seq.*

92.     That at all relevant times herein mentioned, Defendants had direct and indirect access    to    Plaintiff's    copyrighted    materials/work/teaser    video/show/show details/concepts/ideas/elements, and there is a substantial similarity of protectable material in Plaintiff's work and Defendants' work. Further, the works of Plaintiff and Defendants are so strikingly similar that Defendants' copying the Plaintiff's copyrighted materials is the only realistic basis for the Defendants' materials.

93.     That at all relevant times herein mentioned, by directly using and appropriating the images and show details/ideas/elements of Plaintiff's original work, Defendants' infringement is also shown to be willful, intentional, and purposeful, in disregard of and with indifference to Plaintiff's rights herein.

94.     That at all relevant times herein mentioned, Defendants' continued production, televising, broadcasting, marketing, merchandising, distributing and airing of their infringing work "Good Bones" to present date, continues to present date to infringe upon Plaintiff's rights under

the Copyright Statute.

95.     As a direct and proximate result of Defendants' intentional and willful violation of Plaintiff's rights under the Copyright Statute, and by their intentional and willful taking, using, utilizing, copying, implementing and misappropriating Plaintiff's original, creative and unique copyrighted and protected work/material/work/show/show details/show content/show elements/trade secret/teaser video in their infringing work "Good Bones", Plaintiff has suffered and continues to suffer injuries and damages to present date including, but not limited to: compensatory damages in an amount to be determined at trial; actual and/or statutory damages and any other relief provided by the Copyright Act; damages of Defendants' profits attributable to the infringement, under 17 U.S.C. § 504(b); an accounting of such profits realized and received by Defendants; a constructive trust with respect to any such profits of Defendants, and, attorneys' fees and costs as set forth in the Copyright Act.

96.     That Plaintiff has further suffered and will continue to suffer substantial, immediate and irreparable injury, for which there is no adequate remedy at law, in that Plaintiff has been denied credit for creating such show as well as the loss of prestige therefrom. Indeed, Plaintiff has suffered and continues to suffer: loss of earnings from being creator of the show; loss of earnings from being star of the show; loss of earnings from related endorsements, commercial deals, merchandising deals, derivative works deals and other benefits which naturally flow from being star of the show, and, loss of earnings from not receiving the credit, prestige and notoriety which would otherwise be due to Plaintiff herein.

97.     That as Defendants' conduct herein was deliberate, intentional and willful against Plaintiff, Plaintiff is further entitled to punitive damages and claims punitive damages herein. That Plaintiff requests an accounting of, and the imposition of a constructive trust for, Defendants'

profits attributable to their infringement of Plaintiff's copyrighted/protected work/material/work/show/show details/show content/show elements/trade secret/teaser video herein.

98. That Plaintiff requests and claims injunctive relief, including but not limited to, an Order by the Court that Plaintiff be attributed such credit as is due and reflected customarily in the infringing work, and, Plaintiff further requests pre-judgment interest on sums that would have been paid had Defendants not infringed on Plaintiff's copyrighted/protected work/material/work/show/show details/show content/show elements/trade secret/teaser video herein.

99. That at all relevant times herein mentioned, Plaintiff claims damages herein in excess of the jurisdictional limits of this Court and in an amount to be determined at Trial by Jury.

## AS AND FOR A SECOND CAUSE OF ACTION
### VIOLATION OF COLORADO UNIFORM TRADE SECRETS ACT, C.R.S. §§7-74-101 TO 7-74-110, *ET. SEQ.* AND MISAPPROPRIATION

100. Plaintiff repeats, reiterates, re-asserts, re-alleges and restates each and every allegation and factual allegation set forth in paragraphs of the Complaint numbered "1" to "99" with the same force and effect as if more fully set forth at length herein.

101. That at all relevant times herein mentioned, Plaintiff's teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials were/are/remains to be the proprietary work product, design, process, business product and/or trade secrets of Plaintiff MELANIE TOLBERT and constitute a "trade secret" as defined by/in/pursuant to and satisfies the definition of a "trade secret" pursuant to the Colorado Uniform Trade Secrets Act, C.R.S. §7-74-102(4).

102. That at all relevant times herein mentioned, Plaintiff's teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials that were/are/remains to be the proprietary work product, design, process, business product and/or trade secrets of Plaintiff MELANIE TOLBERT, is Plaintiff's design, process, procedure, business information to her profession and business which is secret and is of value and for which Plaintiff took measures to prevent her trade secret from becoming available to persons other than those selected by her to have access to for limited purposes. Plaintiff's teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials constitute business information, including but not limited to, Plaintiff's program, compilation of information and ideas, formatting, staging, design, timing, placement, method, technique and/or process that derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use, and, is/are the subject of efforts that are reasonable under the circumstances.

103. That at all relevant times herein mentioned, Plaintiff's teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials that were/are/remains to be the proprietary work product, design, process, business product and/or trade secrets of Plaintiff MELANIE TOLBERT, constitutes trade secrets because it yields and/or derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain value from disclosure and use such as Defendants herein.

104. That at all relevant times herein mentioned, Plaintiff took reasonable steps to protect her foregoing proprietary work product/teaser video/show/show details/show

content/ideas/work/show elements/protected work/copyrighted materials/trade secrets including, but not limited to taking measures to prevent same from becoming available to persons other than those selected by Plaintiff to have access to same for limited purposes; Defendants' access was for limited purposes for Plaintiff to have her show produced and televised and not for Defendants to unlawfully take/misappropriate herein and to use, produce and televise without Plaintiff and without her consent or authority. Plaintiff further took reasonable steps and efforts to protect her trade secrets by obtaining a Certificate of Copyright Registration for her teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials. See Exhibit "B", *supra.*

105.    That at all relevant times herein mentioned, Defendants knew and/or had reasons to know that Plaintiff's proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets were a trade secret(s) and that they acquired same by/through improper means and not by an accident or mistake. See §7-74-102(2)(a)-(III).

106.    That at all relevant times herein mentioned, Defendants took and misappropriated Plaintiff's proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets fraudulently, willfully, intentionally and took and used same to their financial benefit and enrichment without the express consent or implied authority or consent of/by Plaintiff herein and without the compensation and credit due and owing to Plaintiff for same.

107.    That at all relevant times herein mentioned, Defendants were and are aware of the unlawful benefits conferred to them by their unlawful misappropriation herein, they have solicited these benefits, they have accepted these benefits and, based upon their conduct, omissions and

actions as detailed above, they sought and continue to seek to gain further benefit therefrom by misappropriating Plaintiff's proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets and using/implementing same in their infringing work "Good Bones", and, continues to do so to present date. See Exhibit "C", *supra*.

108.   That at all relevant times herein mentioned, Defendants have retained these benefits, have not compensated Plaintiff for these benefits and do not intend to compensate Plaintiff for these benefits.

109.   That at all relevant times herein mentioned, Defendants have retained these benefits, have not compensated Plaintiff for these benefits and do not intend to compensate Plaintiff for these benefits to Plaintiff's detriment including, but not limited to, financial detriment and other damages and injuries herein.

110.   That at all relevant times herein mentioned, Defendants' unlawful misappropriation of Plaintiff's trade secrets was done in bad faith, was willful and malicious and was in willful and wanton disregard of Plaintiff's rights, and, as such, pursuant to Colorado Uniform Trade Secrets Act, §§7-74-101, *et. seq.*, and specifically §7-74-104(2), Plaintiff is entitled to recover, in addition to compensatory damages including actual damages of economic loss and/or unjust enrichment caused by Defendants' misappropriation herein., punitive/exemplary damages against Defendants herein. Pursuant to Colorado Uniform Trade Secrets Act, §§7-74-101, *et. seq.*, and specifically §7-74-103, Plaintiff is also entitled to injunctive relief and, pursuant to §7-74-105, Plaintiff is further entitled to reasonable attorneys' fees herein.

111.   That at all relevant times herein mentioned, as a direct and proximate cause of Defendants' unlawful misappropriation herein, Plaintiff has been damaged and injured therefrom

including, but not limited to: actual economic loss and damages from Defendants' unjust enrichment herein; loss of earnings from being creator of the show; loss of earnings from being star of the show; loss of earnings from related endorsements, commercial deals, merchandising deals, derivative works deals and other benefits which naturally flow from being star of the show, and, loss of earnings from not receiving the credit, prestige and notoriety which would otherwise be due to Plaintiff herein and other related and consequential damages therefrom.

112.    That at all relevant times herein mentioned, Defendants' unlawful misappropriation herein has caused and will continue to cause Plaintiff economic loss, loss of future business opportunities and will prevent Plaintiff from receiving the due compensation owed to Plaintiff from Defendants herein.

113.    That at all relevant times herein mentioned, all conditions precedent have occurred, been waived or have otherwise been satisfied.

114.    That at all relevant times herein mentioned, as a direct and proximate result of the foregoing, Plaintiff has suffered and will continue to suffer damages herein.

115.    That at all relevant times herein mentioned, Plaintiff respectfully request that this Honorable Court enter judgment against Defendants herein and in favor of Plaintiff MELANIE TOLBERT for all remedies available under Colorado Uniform Trade Secrets Act, §§7-74-101 to 7-74-110, *et. seq.*, including, but not limited to, damages for: actual loss, for potential loss, unjust enrichment, costs, interest and Attorneys' fees, injunctive relief, for Defendants' profits, for punitive damages and for such other relief, in law and/or in equity that this Court deems just and proper.

116.    That at all relevant times herein mentioned, Plaintiff claims damages herein in excess of the jurisdictional limits of this Court and in an amount to be determined at Trial by Jury.

## AS AND FOR A THIRD CAUSE OF ACTION
### CONVERSION

117.   Plaintiff repeats, reiterates, re-asserts, re-alleges and restates each and every allegation and factual allegation set forth in paragraphs of the Complaint numbered "1" to "116" with the same force and effect as if more fully set forth at length herein.

118.   That at all relevant times herein mentioned, Plaintiff's proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets was/is/remains to be the proprietary work product, business information, business idea, plan, property and/or trade secret of Plaintiff MELANIE TOLBERT.

119.   That at all relevant times herein mentioned, Plaintiff's proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets was confidential and constitutes trade secrets because it yields and/or derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain value from disclosure and use such as Defendants herein.

120.   That at all relevant times herein mentioned, Plaintiff took reasonable steps to protect her foregoing proprietary work product, business ideas, business information, property, business property and/or trade secrets herein including, but not limited to, copyrighting her proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets. See Exhibit "B", *supra.*

121.   That at all relevant times herein mentioned, Defendants took/usurped, implemented and used Plaintiff's proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets by

improper means as detailed above, and, not by accident or mistake.

122.    That at all relevant times herein mentioned, Defendants knew and/or had reasons to know that Plaintiff's proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets was a trade secret(s) and that they acquired same by/through improper means and not by an accident or mistake.

123.    That at all relevant times herein mentioned, Defendants took and converted Plaintiff's proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets willfully, intentionally, maliciously, wantonly, fraudulently, unlawfully and/or with complete disregard for Plaintiff's rights thereto.

124.    That at all relevant times herein mentioned, Defendants took and converted Plaintiff's proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets without the express consent, permission or implied authority or consent of/by Plaintiff herein.

125.    That at all relevant times herein mentioned, Defendants were and are aware of the unlawful benefits conferred to them by their unlawful conversion herein, they have solicited these benefits, they have accepted these benefits and, based upon their conduct, omissions and actions as detailed above, they sought out and continue to seek to gain further benefit therefrom by misappropriating Plaintiff's proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets to present date. See Exhibit "C", *supra*.

126.    That at all relevant times herein mentioned, Defendants have retained these

benefits, have not compensated Plaintiff for these benefits and do not intend to compensate Plaintiff for these benefits.

127. That at all relevant times herein mentioned, Defendants have retained these benefits, have not compensated Plaintiff for these benefits and do not intend to compensate Plaintiff for these benefits to Plaintiff's detriment including, but not limited to, financial detriment to present date.

128. That at all relevant times herein mentioned, Plaintiff is the proper owner of Plaintiff's proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets herein and same has been and continues to be wrongfully possessed, taken, usurped, used, misappropriated and converted by Defendants to Defendants' benefit and to Plaintiff's detriment herein.

129. That at all relevant times herein mentioned, Defendants have, without authorization, consent or permission by/from Plaintiff, assumed and exercised the right of ownership of Plaintiff's proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets herein to the alteration of its condition and to the exclusion of Plaintiff's rights as owner thereof.

130. That at all relevant times herein mentioned, Defendants wrongfully deprived Plaintiff of her ownership of her proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets herein and their actions, conduct and omissions as detailed above, denies and violates Plaintiff's dominion over and rights to/in her property herein.

131. That at all relevant times herein mentioned, as a direct and proximate cause of Defendants' unlawful conversion herein, Plaintiff has been damaged and injured therefrom

including, but not limited to: actual economic loss and damages from Defendants' unjust enrichment herein; loss of earnings from being creator of the show; loss of earnings from being star of the show; loss of earnings from related endorsements, commercial deals, merchandising deals, derivative works deals and other benefits which naturally flow from being star of the show, and, loss of earnings from not receiving the credit, prestige and notoriety which would otherwise be due to Plaintiff herein and other related and consequential damages therefrom.

132.    That at all relevant times herein mentioned, Defendants' unlawful conversion herein has caused and will continue to cause Plaintiff economic loss, loss of future business opportunities, and, will prevent Plaintiff from receiving the due compensation owed to Plaintiff therefrom.

133.    That at all relevant times herein mentioned, as a direct and proximate result of the foregoing, Plaintiff has suffered and will continue to suffer damages herein.

134.    That at all relevant times herein mentioned, Plaintiff claims damages herein in excess of the jurisdictional limits of this Court and in an amount to be determined at Trial by Jury.

## AS AND FOR A FOURTH CAUSE OF ACTION
### UNJUST ENRICHMENT

135.    Plaintiff repeats, reiterates, re-asserts, re-alleges and restates each and every allegation and factual allegation set forth in paragraphs of the Complaint numbered "1" to "134" with the same force and effect as if more fully set forth at length herein.

136.    That at all relevant times herein mentioned, Defendants utilized Plaintiff's proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets in their infringing work "Good Bones" and, as a result of same, Defendants have received and retained, and continue to receive and retain to present date, benefits including, but not limited to: increase in profits, increase in

ratings, increase in revenue and other benefits therefrom to the detriment of Plaintiff as, to present date, Defendants have retained these benefits and have not compensated Plaintiff herein.

137. That at all relevant times herein mentioned, Defendants have further received and retained benefits in the form of ratings, notoriety, prestige and acclaim in the entertainment industry and, in particular, in the reality show industry, from and as a result of utilizing Plaintiff's proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets in their infringing work "Good Bones".

138. That, upon information and belief, as a result of the success Defendants received and continue to receive from utilizing Plaintiff's proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets in their infringing work "Good Bones", Defendants renewed/extended their show/program "Good Bones" to a fifth season which is scheduled to air on June 9, 2020.

139. That at all relevant times herein mentioned, the benefits received and retained by Defendants, which they continue to receive and retain to Plaintiff's detriment, are as a result of their use/implementation/copying/taking of Plaintiff's proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets herein.

140. That at all relevant times herein mentioned, and continuing to present date, Defendants have received and retain, and continue to receive and retain these benefits, including financial and economic benefits, and to date, have not, failed to and refuse to compensate Plaintiff herein.

141. That at all relevant times herein mentioned, Plaintiff had, and still has, a reasonable

expectation of being compensated for the creation of her proprietary work product/teaser video/show/show details/show content/ideas/work/show elements/protected work/copyrighted materials/trade secrets herein, which Defendants took, used, copied, implemented and produced in their infringing work "Good Bones", as well as an expectation for credit for same.

142. That at all relevant times herein mentioned, Defendants acted with improper motive in taking, using, implementing, utilizing, copying, misappropriating and converting Plaintiff's original work in their infringing work "Good Bones", and further, intentionally and in wanton disregard for Plaintiff's rights to same, failed, refused and continue to refuse to compensate her for same.

143. That at all relevant times herein mentioned, Defendants' actions, conduct, failure and omissions were intentional, deliberate, malicious, willful and wanton and, were not accident or mistake.

144. That at all relevant times herein mentioned, Defendants have unjustly enriched themselves at Plaintiff's expense and detriment herein and continue to do so to present date.

145. That at all relevant times herein mentioned, Defendants' unjust enrichment has resulted in depriving Plaintiff of the appropriate economic fruits of her labor, as well as, depriving her of the creative credit and opportunity due and owing to her herein.

146. That at all relevant times herein mentioned, and upon information and belief, Defendants have profited substantially from their infringing activities, have collected, and continue to collect monies, profits and the like from their use, taking, producing, televising and misappropriation of Plaintiff's work, and/or any derivatives thereof, and have retained such monies/profits without submitting/tendering/compensating any amount to Plaintiff herein.

147. That at all relevant times herein mentioned, and upon information and belief, as a

direct result of the writing, creation, production, release, marketing, promoting, sales, performances, televising, airing, licensing and/or distribution of Defendants' "Good Bones", the Defendants herein received and accepted, and continue to receive and accept to present date, financial enrichment, financial gains, financial profits, monies, income and/or revenues from the writing, production, sale and world-wide distribution of Defendants' "Good Bones", and, further receive and continue to receive same unjustly and to the financial detriment and expense of Plaintiff as set forth herein.

148. That at all relevant times herein mentioned, and upon information and belief, Defendants were/are contractually, professionally and financially enriched by its show "Good Bones" and continue to be so enriched to present date to the detriment of Plaintiff herein.

149. That at all relevant times herein mentioned, and upon information and belief, the Defendants wrote, created, produced, cleared, approved, released, aired, televised, promoted, marketed, and continue to do so to present date, their "Good Bones" in a total exclusionary fashion Plaintiff, at the expense of Plaintiff, to the Defendants' unjust enrichment, and, contrary to Plaintiff MELANIE TOLBERTs exclusive rights to reproduce and distribute her copyrighted work/show/show details/show content/show elements to the public and/or to authorize derivative works under copyright law to/for Plaintiff's own benefit/financial benefit.

150. That at all relevant times herein mentioned, and upon information and belief, as a direct result of the writing, creation, production, release, marketing, promoting, performances, airing, televising, broadcasting, publishing and distribution of Defendants' "Good Bones", the Defendants herein received and accepted, and continue to receive and accept to present date, financial enrichment, financial gains, financial profits, monies, income, ratings and/or revenues from the writing, production, creations, marketing, televising, broadcasting and distribution of

Defendants' "Good Bones", and, further receive and continue to receive same unjustly and to the financial detriment and expense of Plaintiff as set forth herein. See Exhibit "C", *supra*.

151. That at all relevant times herein mentioned, and upon information and belief, it is against equity and good conscience to permit the Defendants herein to retain the ill-obtained financial unjust enrichments gained and received by Defendants and sought by Plaintiff for recovery under this action herein.

152. That at all relevant times herein mentioned, and upon information and belief, the conduct of Defendants is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury that cannot fully be compensated or measured in money. Plaintiff has no adequate remedy at laws.

153. That at all relevant times herein mentioned, Plaintiff is entitled to damages including, but not limited to, actual economic loss, punitive damages, as well as, to the disgorgement of profits received from the creation of, production of, marketing of, promoting of, releasing of, airing of, televising of, distribution of, merchandising of and/or broadcasting of Defendants "Good Bones" which unlawfully uses, takes and misappropriates Plaintiff's original, creative and unique copyrighted and protected work/material/work/show/show details/show content/show elements/trade secret/teaser video therein.

154. Plaintiff has suffered and continues to suffer injuries and damages to present date including, but not limited to: compensatory damages in an amount to be determined at trial; actual and/or statutory damages and any other relief provided by the Copyright Act; damages of Defendants' profits attributable to the infringement, under 17 U.S.C. § 504(b); an accounting of such profits realized and received by Defendants; a constructive trust with respect to any such profits of Defendants, and, attorneys' fees and costs as set forth in the Copyright Act.

155. That Plaintiff has further suffered and will continue to suffer substantial, immediate and irreparable injury, for which there is no adequate remedy at law, in that Plaintiff has been denied credit for creating such show as well as the loss of prestige therefrom. Indeed, Plaintiff has suffered and continues to suffer: loss of earnings from being creator of the show; loss of earnings from being star of the show; loss of earnings from related endorsements, commercial deals, merchandising deals, derivative works deals and other benefits which naturally flow from being star of the show, and, loss of earnings from not receiving the credit, prestige and notoriety which would otherwise be due to Plaintiff herein.

156. That as Defendants' conduct herein was deliberate, intentional and willful against Plaintiff, Plaintiff is further entitled to punitive damages and claims punitive damages herein.

157. That Plaintiff requests an accounting of, and the imposition of a constructive trust for, Defendants' profits attributable to their infringement of Plaintiff's copyrighted/protected work/material/work/show/show details/show content/show elements/trade secret/teaser video herein.

158. That Plaintiff requests and claims injunctive relief, including but not limited to, an Order by the Court that Plaintiff be attributed such credit as is due and reflected customarily in the infringing work, and, Plaintiff further requests pre-judgment interest on sums that would have been paid had Defendants not infringed on Plaintiff's copyrighted/protected work/material/work/show/show details/show content/show elements/trade secret/teaser video herein.

159. That at all relevant times herein mentioned, Plaintiff claims damages herein in excess of the jurisdictional limits of this Court and in an amount to be determined at Trial by Jury.

## AS AND FOR A FIFTH CAUSE OF ACTION

### PUNITIVE DAMAGES

160.    Plaintiff repeats, reiterates, re-asserts, re-alleges and restates each and every allegation and factual allegation set forth in paragraphs of the Complaint numbered "1" to "159" with the same force and effect as if more fully set forth at length herein.

161.    That at all times herein mentioned, Defendants' conduct complained of herein, and as set for above, were intentional, malicious, reckless, wanton, extreme, outrageous, in total and/or reckless disregard and deliberate indifference to the lawful rights and entitlements of Plaintiff herein.

162.    That at all times herein mentioned, Defendants' omissions, conduct and/or failures, complained of herein, and as set for above, were intentional, malicious, reckless, wanton, extreme, outrageous, in total and/or reckless disregard and deliberate indifference to the lawful rights and entitlements of Plaintiff herein.

163.    That at all times herein mentioned, Defendants' conduct, as complained of herein, warrants and mandates that the jury should be instructed to affixed a monetary award so as to punish Defendants for same outrageous conduct and to further serve as a deterrent to these Defendants and other entities/individuals/parties similarly situated as Defendants from engaging in the same and/or similar conduct who may be considering and/or engaging in intentional, malicious, reckless, wanton, extreme, outrageous conduct in total and/or reckless disregard and deliberate indifference to the lawful rights and entitlements of others, as Plaintiff herein, and to further serve the interest of the public at large.

164.    That pursuant to Colorado Uniform Trade Secrets Act, C.R. S. §7-74-101 to 7-74-110, *et. seq.,* including but not limited to Section 7-74-104(2)m Plaintiff is entitled to and demands

herein, punitive damages against Defendants herein.

165.    That Plaintiff claims punitive damages herein and requests that a judgment be granted against Defendants in the amount of One Hundred Million Dollars, ($100,000,000.00) and/or in an to be determined at trial by the Jury.

## ALL CONDITIONS PRECEDENT HAVE BEEN MET, SATISFIED AND/OR WAIVED

## PLAINTIFF DEMANDS TRIAL BY JURY

Plaintiff respectfully demands and requests a trial by jury in the within action.

**WHEREFORE,** Plaintiff MELANIE TOLBERT prays for relief as follows:

1.    For a judicial determination that Plaintiff's copyright/trade secret has been infringed upon by Defendants;

2.    For injunctive relief against Defendants, enjoining Defendants from continuing to infringe on Plaintiff's copyright/protected work/trade secret;

3.    For damages against Defendants in such amount as may be found or as otherwise permitted by laws;

4.    For punitive and/or exemplary damages;

5.    For all recoverable damages pursuant to the Copyright Act, 17 U.S.C. 101 *et seq.*;

6.    For all recoverable damages pursuant to the Colorado Uniform Trade Secrets Act, C.R.S. §§7-74-101 TO 7-74-110, *et. seq.*;

7.    For attorney's fees and costs, and

8.        For any such other and further relief as the Court may deem just and proper.

Dated: June 1, 2020

Respectfully Submitted By:


/s/  JoAnn Squillace_____
JoAnn Squillace, Esq.
DRUMMOND     &     SQUILLACE,     PLLC
Attorneys for Plaintiff MELANIE TOLBERT
175-61 Hillside Avenue, Suite 205
Jamaica, New York 11432
Tel: (718) 298-5050
Fax: (718) 298-5554
jsquillace@dswinlaw.com



/s/  H. Edgar Howard_____
H. Edgar Howard, Esq.
FORD, HOWARD & CORNETT, P.C.
Attorneys for Plaintiff MELANIE TOLBERT
P.O. Box 388
Gadsden, AL 35902
Tel: (256) 546-5432
Fax: (256) 546-5435
ed@fordhowardcornett.com

## PLAINTIFF'S VERIFICATION

STATE OF ALABAMA

COUNTY OF ETOWAH

MELANIE TOLBERT, being duly sworn, deposes and says that she is the deponent and is the above named Plaintiff; that deponent has read the foregoing SUMMONS, COMPLAINT AND JURY DEMAND and knows its contents; that the contents of same are true to deponent's knowledge, except as to those matters stated to be alleged upon information and belief and, as to those matters, deponent believes same to be true.

_____
MELANIE TOLBERT

Sworn to before me this 1st day of June 2020

_____
NOTARY PUBLIC
my Commission Expires 8/20/23

UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

-----------------------------------------------------------------------X

MELANIE TOLBERT,

                        PLAINTIFF,                   Docket No.:

        v.

HIGH NOON PRODUCTIONS, LLC,

HIGH NOON PRODUCTIONS, LLC d/b/a

HIGH NOON ENTERTAINMENT, and

HIGH NOON ENTERTIANMENT,

                        DEFENDANTS.

-----------------------------------------------------------------------X

## SUMMONS, COMPLAINT AND JURY DEMAND

### *DRUMMOND & SQUILLACE, PLLC*
175-61 Hillside Avenue, Suite 205
Jamaica, New York 11432
Tel: (718) 298-5050; Fax: (718) 298-5554

### FORD, HOWARD & CORNETT, P.C.
140 South 9th Street
Gadsen, Alabama 35901

Tel: (256) 546-5432; Fax: (256) 546-5435

*Attorneys for Plaintiff MELANIE TOLBERT*